UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FRANK MANUEL HERNANDEZ,<br><br>   Plaintiff<br><br>v.<br><br>PERRY RUSSELL, et al.,<br><br>   Defendants | Case No.: 3:20-cv-00114-MMD-CSD<br><br>**Report & Recommendation of United States Magistrate Judge**<br><br>Re: ECF No. 140 |

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' motion for summary judgment. (ECF Nos. 140, 142-1, 142-2.) Plaintiff filed a response and was granted leave to file a supplemental response. (ECF Nos. 147, 148-1.) Defendants filed a reply. (ECF Nos. 151, 153-1 to 153-4.)

After a thorough review, it is recommended that Defendants' motion be granted.

**I. BACKGROUND**

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 8.) The events giving rise to this action took place while Plaintiff was housed at Warm Springs Correctional Center (WSCC). (*Id.*)

The court screened Plaintiff's complaint and allowed him to proceed with an Eighth Amendment excessive force claim against defendants Lennon and Craig (mistakenly named by Plaintiff as Creg). The claim is based on allegations that on February 2, 2019, Plaintiff was housed in Unit 4B at WSCC, and Lennon announced to the unit that if the inmates wanted to

play around, he had a 40 mm gun and he was waiting to use it. Plaintiff contends he was standing in front of cell 34 when a red dot appeared on a wall near him. Plaintiff believed it was a laser pointer from Lennon's gun. As Plaintiff turned to locate the source of the red dot, the laser tracked across Plaintiff's right eye. Plaintiff avers that his vision immediately became impaired and a white dot appeared in his vision. When the spot did not go away by the next day, Plaintiff reported the issue to medical staff. Plaintiff claims that Officer Craig watched Lennon point the laser at inmates and did nothing to stop him. (*See* Screening Order at ECF No. 7.)

Defendants move for summary judgment, arguing that they are entitled to qualified immunity because Defendants did not apply force, and to the extent the allegation of shining a laser at Plaintiff's eyes can be construed as the use of force, it was a *de minimis* use of force, and was not for any malicious purpose so as to violate the Eighth Amendment. Defendants further argue that Craig did not personally participate in the alleged constitutional violation, and there are no facts that establish he had knowledge or the opportunity to prevent the use of the laser on the tier.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

### A. Qualified Immunity

Qualified immunity "protects government officials who violate constitutional rights from civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Simmons v. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (citation and quotation marks omitted). Qualified immunity looks at two questions. First, whether the alleged conduct violated the plaintiff's constitutional rights viewing the facts alleged in the light most favorable to the plaintiff. *Id*. (citation omitted). Second, whether the relevant right was clearly established at the time so that the defendant would have known he was

violating the right. *Id*. If the answer to either of those questions is no, the defendant is entitled to qualified immunity. *Id*.

**1. Was there a Violation of Plaintiff's Eighth Amendment Rights?**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. It "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). The "unnecessary and wanton infliction of pain...constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id*. (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v. McKinney*, 394 F.3d 710, 711 (9th Cir. 2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

In determining whether the use of force is excessive, courts look at various factors, including: "the extent of the injury suffered by an inmate[;]" "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of the forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

**a. Facts**

At the time of this incident, Plaintiff was housed at WSCC, in Unit 4B, Cell 34A. (ECF No. 140-1 at 4.) Lennon was employed as a correctional officer, assigned to WSCC Unit 4B

"control." (ECF No. 140-2 at 5.) Craig is a senior correctional officer at NDOC, and on the date in question, he was assigned to WSCC Unit 4B as a "rover." (*Id*. at 4.)

On February 2, 2019, Lennon had a keychain laser pointer attached to his car keys. (*Id*. at 5.) Lennon had used a laser pointer during department trainings. (*Id*.) Craig was also a trainer for the department and had used a laser pointer during training. (*Id*. at 4.) As such, Lennon did not believe he was prohibited from having the laser pointer in the prison. (ECF No. 151-5 at 4, 9, responses to Interrogatories 2, 3, 13.)

While Lennon was in the "control bubble," he observed inmates on the north side of the housing tier talking about attempting to get tattoo ink to the south side of the housing tier. (*Id*. at 5.) Lennon reached into his lunch bag for a pen, and pulled out a pen and attached to the pen were his car keys and the laser pointer, which was on his keychain. (*Id*.)

Craig and another unidentified non-defendant correctional officer arrived in the control bubble "for a break." (*Id*.) Lennon began "fiddling" with the laser while talking with Craig and the other officer. (*Id*.) Craig witnessed Lennon "pointing the laser around the control bubble." (*Id*. at 3.)

Lennon then observed the inmates gathering at the table, and he determined that the group had become "too large for one table" so Lennon tried to get the inmates' attention by flashing his light, but most of them did not respond because they had their backs to Lennon. (*Id*.) Having his keychain in his hand, Lennon then used the laser pointer and tried to shine it on the table to get the inmates' attention, to no avail. (*Id*.) One of the inmates at the table told the others that Lennon was watching, and they dispersed to their cells, but Lennon saw that a package had been handed off between two inmates. That inmate took the item to cell 9A. Another inmate also took something to cell 62A. (*Id*.)

1  "Having a small view of the sink and toilet in cell 62," Lennon shone the light into the
2  cell, but that did not get the inmate's attention. Lennon then went out on the tier to conduct a tour
3  and compliance checks of those two cells. When Lennon went to cell 62, the inmate met Lennon
4  at the door and got in Lennon's face and said that Lennon had shone a laser into his eye while he
5  was shaving. Lennon maintains he never pointed the laser on an inmate." (*Id.*) It is undisputed
6  that was not Plaintiff's cell.

7  Lennon contacted Sergeant Halverson and explained the situation, and Sergeant
8  Halverson told Lennon not to use the laser pointer in the institution anymore. (*Id*. at 6.) Warden
9  Russell subsequently issued an email stating that laser pointers were not permitted in the
10 institution. (*Id*.) Lennon removed the laser pointer from his keychain and disposed of it in the
11 garbage can. (*Id*.)

12  On February 3, 2019, Plaintiff filed an inmate request stating that he was hit in the eye by
13 a laser from Lennon and had a dark spot in his vision that persisted overnight. He requested to
14 see an optometrist. (ECF No. 142-1.)

15  Plaintiff saw the prison's contracted optometrist, Dr. Seljestad, for an eye examination on
16 February 21, 2019. (Dr. Seljestad Decl., ECF No. 142-2 ¶ 4.) According to Dr. Seljestad,
17 Plaintiff reported the presence of a shadow or dead spot in his right eye which he claimed
18 resulted from a laser hitting his eye on February 2, 2019. (*Id.* ¶ 6.) Dr. Seljestad did not detect
19 any dead spot or laser burn via an "OCT scan." The OCT scan was "unremarkable," with "no
20 evident loss of nerve fiber layer tissue[.]" (*Id.* ¶ 7.) Unrelated to the alleged laser burn,
21 Dr. Seljestad noted elevated intraocular pressure which is a risk factor for mild primary open-
22 angular glaucoma (POAG). (*Id.* ¶ 8.) Glaucoma is caused by an increase in pressure to the eye,
23

and not by any laser-related injury. (*Id.* ¶ 9.) As such, Dr. Seljestad referred Plaintiff to be seen at the glaucoma clinic for a retinal OCT regarding the mild POAG risk. (*Id.* ¶ 10.)

Plaintiff does states that he had a bright spot when he closed his eyes that lasted for about three days, and he acknowledges that by the time he saw Dr. Seljestad, all of his symptoms had resolved. (ECF No. 147 at 4, 7.)

Plaintiff admits that Dr. Seljestad could not see damage on the sonogram, but he asserts that Dr. Seljestad told Plaintiff he saw a blue ring on the scan that he could not explain, which could be from the laser. Plaintiff asserts that the referral to the glaucoma clinic was because a laser can seal the duct that fluid is released from in the eye, which could cause glaucoma later on. (ECF No. 147 at 3.)

A further declaration of Dr. Seljestad was filed with Defendants' reply brief. Dr. Seljestad states that he never indicated to Plaintiff there was a "blue ring" on his iris that he could not understand or that it could be the result of a laser burn. (ECF No. 153-1 ¶ 8.) The "blue ring" from the OCT report is part of a statistical analysis of the thickness of the ganglion cell layer of the retina of the right eye. The color blue indicates the layer thickness is within 5 microns of normal thickness, which is within the margin of error. (*Id.* ¶ 9.) A blue ring on visual inspection of the iris itself is usually indicative of normal, age-related cholesterol and lipid deposits. (*Id.* ¶ 10.) Dr. Seljestad goes on to state that a laser cannot seal the eye's drainage channels, and there was not any indication from Plaintiff's scans that his eye's drainage channels were otherwise sealed. (*Id.* ¶ 12.) Dr. Seljestad reiterates that he referred Plaintiff to be seen in the glaucoma clinic for a retinal OCT regarding the mild POAG risk, and his subsequent notes indicate that the follow-up retinal OCT was negative for glaucoma and otherwise unremarkable. (*Id.* ¶ 13.)

### b. Lennon

Preliminarily, Plaintiff does not dispute that it was a keychain laser pointer that Lennon used, and not a laser pointer on a gun, as Plaintiff alleged in his complaint. The parties dispute whether Lennon pointed the laser *at Plaintiff*. Lennon maintains that he only pointed the laser into the north side of the housing tier while Plaintiff was housed in the south side. Plaintiff claims Lennon did point the laser in his direction, though he does not state where he was when Lennon pointed the laser at him.

The court agrees with Defendants that even accepting as true Plaintiff's allegation that Lennon briefly tracked the laser pointer across Plaintiff's field of vision, this amounts to no more than a *de minimis* use of force, if it can be construed as a use of force at all. Plaintiff's allegation is that when he saw a red dot on the wall, and as he tuned to locate the source of the dot, the laser tracked across his right eye.

Not "every malevolent touch by a prison guard gives rise to a federal cause of action...The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). Even accepting as true that Lennon did point the laser in Plaintiff's vicinity, and that it tracked across his right eye, this is not the sort of "force" that is "repugnant to the conscience of mankind."

Moreover, the court finds there is no evidence that Lennon used the laser "maliciously and sadistically to harm." Instead, the evidence demonstrates that Lennon used the laser pointer in a good-faith effort to maintain security. Plaintiff does not dispute that a large group of inmates

had gathered at a table, or that the inmates were trying to smuggle contraband—tattoo ink—from the north side of the housing unit to the south side.

Plaintiff focuses on the argument that Lennon should not have had the laser pointer in the first place, but there is no evidence to refute the statements of Lennon and Craig in their reports that they had used laser pointers for training before. Even if prison officials ultimately determined that laser pointers were not permitted, there is a lack of evidence that Lennon used the laser with an improper motive or purpose to cause harm. Instead, it was used to try and disperse a large group of inmates and to prevent the smuggling of contraband. *See Simmons v. Arnett,* 47 F.4th 927 (9th Cir. 2022) (prison guard's decision to shoot inmate with sponge rounds to break up a fight was not excessive force where there was no evidence the guard acted maliciously and sadistically).

For these reasons, the court finds that Lennon did not violate Plaintiff's Eighth Amendment rights.

### d. Craig

There is no dispute that Craig did not personally shine a laser on the tier. There is also no evidence that Craig directed Lennon to use the laser pointer. Craig argues there is no evidence he knew Lennon was pointing the laser into the tier and failed to intervene, or that he meaningfully participated in the use of the laser. Craig maintains it is undisputed that he did not see Lennon point the laser into the north tier.

In his response, Plaintiff argues that Craig "admitted in his interrogatories he saw C/O Lennon using said la[s]er *on inmates*[.]" (ECF No. 147 at 1.) In discovery, Craig was asked if he witnessed Lennon use a laser pointer while stationed/sitting with Craig on the date of the incident (in the Unit 4B control bubble). Craig responded affirmatively. (ECF No. 151-6 at 5,

response to interrogatory 3.) Craig did not respond that he saw Lennon using the laser *on inmates* or *on the tier*. Instead, Craig's response is consistent with his report, which states: "He (Lennon) was pointing the laser pointer around in the control bubble of Unit 4 Wing B. I did not see him point it onto the North tier. Inmate [name redacted] lives on the North Tier in Cell 62. I did not see Officer Lennon point it at Inmate [name redacted]." (ECF No. 140-2 at 4.)

Plaintiff argues that when a law is being broken an officer has an obligation to intervene. That is not an accurate statement of the law.

"Officers can be held liable for failing to intercede in situations where excessive force is claimed to be employed by other officers only if 'they had an opportunity to intercede.'" *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2023) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000)). "Furthermore, officers can be held liable for excessive force on a theory of integral participation only if they participate 'in some meaningful way' in the specific actions that constituted the violation.'" *Id.* (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)). An officer "cannot be held liable for fleeting acts which they did not commit, came without warning, and could not have prevented." *Id.*

Here, even accepting Plaintiff's allegation as true that Lennon pointed the laser at him, there is no evidence that Craig knew Lennon was doing so, or that he could have intervened. Therefore, the court finds that Craig did not violate Plaintiff's Eighth Amendment rights.

**2. Was the Constitutional Right at Issue Clearly Established?**

Whether the right was clearly established is a question of law for the court. *Simmons*, 47 F.4th at 934 (citation omitted). "For a right to be clearly established, the right must first be defined at the appropriate level of specificity." (citation and quotation marks omitted). Then, "[t]he contours of [that] right must be sufficiently clear that a reasonable official would

understand that what [the official] is doing violates that right." *Id*. (citation omitted, alterations original). "There need not be a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (citation omitted). It is the plaintiff's burden to prove "the right allegedly violated was clearly established at the time of the violation." *Id*. at 934-35 (citation omitted).

Plaintiff focuses on the argument that individuals have been prosecuted for pointing a laser at a commercial airplane, and therefore, argues that it should be illegal to point a laser at a person's eyes. Plaintiff is referring to a *criminal* prosecution for pointing a laser at an aircraft, while this case involves the alleged violation of civil rights under the Eighth Amendment of the Constitution pursuant to 42 U.S.C. § 1983. If a court has found a criminal defendant guilty of an offense involving pointing a laser at an airplane, that does not define the right at issue here at the appropriate level of specificity.

The court is unaware of a case, and Plaintiff has not pointed to one, that holds that using a keychain laser pointer to get the attention of inmates such that it briefly pans over an inmate's field of vision, amounts to a use of force, let alone excessive force. Therefore, Defendants are entitled to qualified immunity and their motion for summary judgment should be granted.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 140).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's

12

Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 6, 2024

_____
Craig S. Denney
United States Magistrate Judge